UNITED STATES DISTRICT COURT
OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| XURUI DENG, a/k/a SHERRY YOUNG, | ) | Civil Action No. |
|  | ) | **04-12421-JLT** |
| Plaintiff | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| METROPOLITAN LIFE INSURANCE | ) |  |
| COMPANY (a/k/a METLIFE), | ) |  |
|  | ) |  |
| Defendant | ) |  |
|  | ) |  |

**PLAINTIFFS' SUR-REPLY TO DEFENDANT'S
REPLY BRIEF REGARDING THE MOTION TO COMPEL**

*I. Introduction / Summary of Argument*

The Defendant's Reply Brief seriously misstates the procedural history of this case and

the issue that is presently before the Court. That issue is whether, in response to the Motion to

Quash filed by the Attorney General's Office, the Defendant has met its burden with respect to

overcoming the "*law enforcement and deliberative process privileges*" discussed in the Attorney

General's Memorandum in Support of the Motion to Quash (hereinafter referred to as the

"*Attorney General's Memorandum*"). The Attorney General's Memorandum takes the position

that the Defendant has clearly not met that burden. Based upon Plaintiff's counsel's review of

the papers filed by the Attorney General, the papers filed by the Defendant in connection with its

Opposition to the Motion to Quash (which did not include any affidavits or supporting materials

other than copies of some procedural papers), the papers filed by the Defendant in support of its

Motion to Compel (which were substantially identical to the papers filed in connection with

Defendant's Opposition to the Motion to Quash), the state of the pleadings, and the discovery that was completed under this Court's initial Discovery Order (a copy of which has been attached hereto as Annex A), Plaintiff's counsel agreed with the Attorney General. By reason of the fact that the Defendant had elected to file a Motion to Compel (the filing of which served no apparent purpose, because it was made redundant and unnecessary by the prior filing of the Motion to Quash), Plaintiff's counsel was, accordingly, required to file an Opposition to the Motion to Compel ("*Plaintiff's Opposition*") formally agreeing with the Attorney General's position. The Defendant then took the opportunity to file a "*Reply Brief*" which, yet again, did not include or refer the Court to any affidavits or other material that would support a finding that Defendant had met its burden, but which instead asserted that the position taken by Plaintiff's counsel in Plaintiff's Opposition made the Plaintiff "***suspect***" (Reply Brief, at p. 3, emphasis in original), i.e., that the position taken by Plaintiff's counsel served to support an inference that Plaintiff may have "*committed the murder of her husband*." (*Id.*, at p. 2).

In view of the above-described circumstances, the undersigned counsel will be forgiven for submitting a somewhat detailed sur-reply with supporting exhibits.

### Summary of the Reply Brief and its Inadequacies under the Applicable Rules

The Reply Brief is filled with unsupported factual assertions and innuendo, none of which is, as contemplated by Local Rule 7.1, supported by "*affidavits or other documents setting forth or evidencing the facts upon which the motion is based.*" There is only one factual assertion made anywhere within the Defendant's Reply Brief that contains any citation whatsoever to

anything, and that citation does not support the assertion made. [1]  More specifically, the

Defendant asserts, at page 1 of its Reply Brief, that  *"MetLife was told that Plaintiff was a*

*suspect"* and then asserts, parenthetically, as support for this assertion: *"(this was confirmed in*

*the papers file [sic] by the ADA [sic] in which it [sic] asserted that Plaintiff has not been ruled*

*out as a suspect)."*   No papers have been filed by the ADA (Assistant District Attorney), and the

papers filed by the Assistant Attorney General (specifically, the Motion to Quash and the

Attorney General's Memorandum) simply note as follows:

> *In this case, the District Attorney's Office has sent a letter to the defendant insurance company indicating that the investigation into the murder is still open and **nobody has been ruled in or out** as a suspect.  The defendant's attempt to subpoena the investigating officer is based on mere speculation that his investigative files or deposition testimony will yield any information beyond those facts.*

(Quoting from page 3 of the Attorney General's Memorandum, emphasis added.)  (The Plaintiff

is unable to provide the Court with a copy of the letter referenced by the Attorney General

because, as of the time at which this memorandum was filed, the Defendant had not produced a

copy of that  letter, as the Defendant should have done last year under this Court's initial

discovery order, a copy of which has been attached hereto as Annex A.  *See also*, in this regard,

Annex B at page 2.)

---

[1] The Defendant's failure to provide parenthetical citations to affidavits or other documents supporting the central factual representations made to the Court in support of its Motion to Compel Discovery and in its Opposition to the Motion to Quash, and the fact that the Plaintiff would be compelled to file a sur-reply if the Defendant repeated this failure in its Reply Brief, were explicitly called to the Defendant's attention in a telefaxed letter from Plaintiff's counsel dated February 29, 2004, a copy of which has been attached hereto as Annex B.  As noted within that letter, "*the need for ongoing replies and sur-replies is reduced if any assertions of fact are linked to parenthetical citations to affidavits or other documents setting forth or evidencing those facts*." *Id*., at page 2, emphasis added.

With the exception of the above-noted erroneous citation, there are no citations to anything within the Reply Brief, much less to any affidavits or other documents, that might support the "*facts*" or innuendo asserted within the Defendant's Reply Brief. Instead, each of the factual assertions made by the Defendant is simply baldly asserted, without any guidance as to the basis that Defendant believes it might have for making such assertions to this Court. Examples of these assertions have been set forth below, in the order in which they appear within the Reply Brief, along with the Plaintiff's sur-reply to same.

1)     Allegation set forth at page 1 of the Reply Brief: "*Plaintiff, in her Opposition, suggests that MetLife did nothing in response to her claim to the proceeds of the policy … so that it could use the proceeds for its own enjoyment. This is a gross mischaracterization of the facts.*"

The Defendant does not cite to any page numbers in the Plaintiff's Opposition, but this assertion by the Defendant appears to represent a characterization of the Plaintiff's statement at page 4 of Plaintiff's Opposition that, by reason of the Defendant's failure to respond to her demand letter or to take any action on her claim for benefits, the "*Plaintiff was left to infer that MetLife lacked any good faith basis for the conduct that it was engaging in, and that MetLife had instead elected to effectively force her to file a lawsuit in order to obtain relief in this regard.*" (Quoting from Plaintiff's Opposition, at page 4). In any event, the Defendant does not cite any material that would support a finding that the "*suggestion*" that Defendant attributes to the Plaintiff is, in fact, a mischaracterization at all. The Defendant has not provided this Court with any affidavits or other supporting material on any subject, and thus one is unable to determine, from the submissions made by the Defendant, whether it did anything at all in response to the claim for benefits. The material placed before the Court by the Attorney General and by the Plaintiff within the exhibits to Plaintiff's Opposition would not support a finding that the

4

Defendant did anything more in response to the Plaintiff's claim under the insurance policy other than (i) to engage in some limited communications with the District Attorney's office (See, the Attorney General's Memorandum, at p. 3) and (ii) to send out the very brief and, as far as can be determined from the record before the Court, misleading letters that are attached to Plaintiff's Opposition during late 2001 and during 2002. (*See*, Annexes A and B to the Plaintiff's Opposition.) The only additional activities engaged in by the Defendant in response to the insurance claim that can be discerned from the material before the Court are the very limited activities that took place in 2001 and 2002 and that are discussed *infra* at page 6. The Plaintiff is unable to provide the Court with any insight into what activities, if any, the Defendant may have engaged in during 2003 through 2004, because the documents produced by the Defendant pursuant to this Court's initial Discovery Order do not include a single document showing any activity by the Defendant throughout the years 2003 and 2004, except insofar as the Defendant's "*Privilege Log*" (a copy of which has been attached hereto as Annex C) indicates that there were internal "*transmittals*" of some unidentified papers on February 13, 2003 (shortly after Plaintiff's prior counsel sent his initial letter on February 3, 2003), on July 31, 2003 (shortly after Plaintiff's prior counsel sent his formal demand letter on July 7, 2003), and on November 1, 2004 (shortly after service of process was effected in this action). (Copies of the letters sent to Defendant by Plaintiff's prior counsel during 2003 appear as part of Annexes B and C to the Plaintiff's Opposition to the Defendant's Motion to Compel. Copies of the initial Court papers in this matter, which was removed to this Court from the Middlesex Superior Court, appear as part of the initial filings made in this Court). That, however, is it. There is no evidence within the documents produced by the Defendant of any other activity or effort whatsoever by the

5

Defendant during 2003 and 2004, and the Defendant does not cite the Court to any evidence of any such activity within Defendant's Reply Brief or in any of the other voluminous papers that it has filed to date with this Court.

2)   Allegation set forth at page 1 of the Reply Brief: "*Upon receiving the claim for the proceeds of the Temporary Insurance Policy ... MetLife inquired and discovered that Plaintiff's husband was murdered shortly after he applied for a life insurance policy.*"

The Defendant does not refer the reader to any evidence or documentation showing how Metlife "*inquired and discovered*" these facts. In truth, the fact that the Plaintiff's husband was murdered was not "*discovered*" by the Defendant at all: the fact that he was slain by an unidentified gunman was reported the very next day in a lengthy article in the Boston Globe, the text of which of was included in the materials produced from the Defendant's files pursuant to this Court's initial Discovery Order. (*See*, the copy of the text of that article that appears as Annex D hereto). The fact that he died of multiple gun shot wounds to the head was also reflected in records on file at the Massachusetts Medical Examiner's Office, such as his death certificate, and access to all of those records was given to the Defendant by the Plaintiff herself. (*See*, Annex E hereto). Similarly, the fact that he had applied for a life insurance policy not long before his death on October 10, 2001 was not the subject of any mystery uncovered by the Defendant: As the Defendant's own insurance agent noted, the Plaintiff and her late husband had, together, and "*like a lot of people after Sept. 11*," applied for life insurance policies in the days immediately following the attack upon the United States that had taken place on September 11, 2001. (*See*, Annex F hereto, emphasis added.) Thus, to the extent that the Defendant "*inquired and discovered*" anything, the record indicates that it did so by simply reading the newspaper and "*discovering*" documents provided by the Plaintiff herself or by the Defendant's

6

own insurance agent (*Id*.). (It should also be noted that the Plaintiff submitted to an interview by the Defendant, and that there is no allegation or indication that she was not entirely forthcoming within that interview. *See*, Annex G hereto.)

(3)     Allegation set forth at page 1-2 the Reply Brief: "*MetLife immediately tried to determine whether Plaintiff was a suspect only because she was the wife a of a person who was murdered, or whether there was more evidence to suggest that she may actually be the prime suspect. It goes without saying that the claim will be denied should it be revealed that the plaintiff committed the murder of her husband. [T]he authorities [are] refusing to rule out Plaintiff as a suspect*"

Again, MetLife cites no support for its assertions in this regard. The fact that, as noted at page 3 of the Attorney General's Memorandum, the District Attorney may have responded to inquiries from the Defendant by noting that "*the investigation into the murder is still open and nobody has been ruled in or out as a suspect*" does not provide any basis for inferring that the Plaintiff, as distinct from anyone else, may have "*committed the murder of her husband,*" (quoting from Defendant's Reply Brief, at page 2), and it certainly provides no basis for making a claim to that effect to this or to any other Court. This is made clear by the fact that, although the Defendant apparently feels no compunction about tossing such allegations around within its legal briefs without any supporting citations, it found itself unable, within its response to the Complaint, to assert a defense or file a counterclaim to that effect consistent with its obligations under Rule 11. The fact that the Defendant has no basis for making such an allegation is also evidenced by the fact that, as alleged at paragraph 8 of the Complaint, and as admitted in the above quoted sentence from the Reply Brief, the Defendant has thus far "*failed to deny*" the claim for insurance benefits. (At paragraph 8 of its Answer, the Defendant denied that it had "*failed to deny*" the claim submitted under the policy, but as noted in the above-quoted section of

the Reply Brief, the Defendant contends that "*It goes without saying that the claim <u>will be denied</u> should it be revealed that the plaintiff committed the murder of her husband.*" Emphasis added.)[2]

(4)    <u>Allegation set forth at page 2 the Reply Brief</u>: "*It was agreed at the conference before this Court that MetLife would take the deposition of the investigating detective and, if there appears there was no fraud, then it would interplead the money into the Court.*"

This allegation is, again, set forth without any citation to anything that would support a finding of any such agreement. The Attorney who signed the Reply Brief on behalf of the Defendant was not present at the conference, and he has not provided the Court with a transcript. The undersigned counsel, who was present at the conference, respectfully submits that, if a transcript of that conference can be obtained,[3] it would show that Defendant's counsel, after

---

[2] The Court may wish to consider the significance of the fact that the Defendant's Reply Brief serves to establish that the two central factual averments in the Complaint that the Defendant failed to admit in its Answer have now been effectively admitted. More specifically, the only reason why the Plaintiff was not in a position to seek judgment on the pleadings at the outset of this case (and thereby dispose of any professed need for discovery) was that the Defendant's Answer (1) denied the allegation at paragraph 8 of the Complaint that the Defendant had failed to "*deny or pay the policy,*" and (2) professed that the Defendant lacked information or knowledge sufficient to form a belief as to whether or not the Plaintiff's late husband was in fact dead. Given that the Defendant's Reply Brief effectively admits both of these facts, it is respectfully submitted that the Court may wish to consider setting this matter down for a hearing on a motion for judgment on the pleadings, and not even reaching the issues presented in the Motion to Quash unless a motion for judgment on the pleadings is denied. It is also respectfully submitted that the Court may wish to consider ordering proceedings to determine whether, in failing to either pay or deny the insurance claim and thus forcing the Defendant to file a lawsuit, and in then filing an Answer in which it failed to admit non-controversial facts, the Defendant was not simply engaged in dilatory claims handling and sloppy pleading, but was instead intent upon trying to find a way to pursue discovery against law enforcement personnel in a case that never should have had to have been brought, and that, having been brought, should have been resolvable on the face of the pleadings, without the necessity of any discovery whatsoever.

[3] In the event that a stenographer was present during the Rule 16 conference and a transcript of that conference can be obtained, then, notwithstanding the fact that it is the Defendant, rather than the Plaintiff, who is seeking to inject allegations about what transpired at that conference into the current dispute, the Plaintiff would be willing to bear some portion of the cost of having a transcript produced if the Court believes that this would be appropriate.

8

admitting the existence of the policy, and upon being questioned as to why it had not yet been

paid, represented to the Court his client wanted to try to conduct the deposition of the

investigating detective, and that, if the Court allowed Defendant's counsel to pursue that

deposition, it was expected that this would allow the matter to then be settled in short order. It is

also respectfully submitted that such a transcript would show that, given the positions of the

parties as represented to the Court at that time, it was suggested that the Defendant would be kept

"*on a short leash*" in this regard. Given these circumstances, the undersigned counsel did not

object to allowing the Defendant to try to conduct that deposition, and in fact subsequently

sought to assist the Defendant in pursuing that deposition (*see*, Annex I hereto, at page 2). [4]

However, there is no basis whatsoever for suggesting that the Plaintiff "*agreed*" that such a

deposition needed to go forward, or that the Plaintiff was either asked to agree, or agreed, to any

waiver of Plaintiff's right to raise objections as the Defendant sought to pursue such a deposition

within the time period granted by the Court. To the contrary, the lack of any such agreement,

either prior to, during, or following the conference, is evidenced by the letters that were sent to

Defendant's counsel both prior to and on the date of the conference in question, copies of which

have been attached hereto as Annexes H and I, respectively. (The copy of Annex H that has been

attached hereto has been redacted so as to delete specific references to the settlement offer that

the Plaintiff made to the Defendant under the local rules.) (The Plaintiff also notes that, to the

---

[4] The Plaintiff did not learn until mid-February, upon the filing of the Attorney General's Memorandum
and well after the Rule 16 conference, that the state of the investigating detective's investigation (i.e.,
that "*nobody has been ruled in or out as a suspect,*") had already apparently been made known to the
Defendant through a letter from the Assistant District Attorney which, as noted, has still not been
produced by the Defendant for the Plaintiff's inspection and copying.

best of the undersigned counsel's recollection, and contrary to the representations made within

the Defendant's Reply Brief, there was no reference whatsoever to any potential *"interpleader"*

of any funds during the conference referred to within the Defendant's Reply Brief.)

(5)    Allegation set forth at page 2 the Reply Brief:  *"[W]hen the Assistant District Attorney refused to appear and did not file a motion to quash, MetLife filed a motion to compel the deposition."*

It will be appreciated that the above quoted, unsupported assertion actually involves three

distinct assertions, each of which is, itself, entirely unsupported: (1) that the *"Assistant District

Attorney refused to appear,"* (2) that MetLife filed a motion to compel the deposition *"when the

Assistant District Attorney refused to appear,"* and (3) that Metlife's Motion to Compel was to

some extent filed as a result of the absence of a *"a motion to quash."*

Addressing these three assertions in reverse order, the third leg of the representation made

to this Court, i.e. that MetLife's Motion to Compel was in some sense prompted by the absence

of a motion to quash, is demonstrably false based upon the Court's own docket.  This Court's

docket will show that the Motion to Quash, dated February 9, 2005, was filed well in advance of

the filing of the Motion to Compel, dated February 15, 2005.  (The issue of why, given the

Motion to Quash, the Defendant even felt the need to file its Motion to Compel, the substance of

which is identical to the Defendant's Opposition to the Motion to Quash, is discussed *infra* at

note 5 on page 19.)

The second leg of the representation made to this Court, that MetLife filed a motion to

compel the deposition *"when the Assistant District Attorney* [allegedly] *refused to appear,"* is

also demonstrably false.  The Defendant filed a Motion to Compel the Deposition of Sergeant

Foster, not the Assistant District Attorney, and it did not file its Motion to Compel the

10

Deposition of Sergeant Foster until almost four weeks after the Assistant District Attorney supposedly "*refused to appear*" on January 18, 2005. (<u>*See*</u>, for the date of the Assistant District Attorney's scheduled deposition, the subpoena that the Defendant issued to her, a copy of which is attached hereto as Annex J.)

The first leg of the above-quoted assertion, that "*the Assistant District Attorney refused to appear,*" is simply another bald assertion, unsupported by any affidavits or other supporting material. As may be seen from page 2 of the letter to Defendant's counsel attached hereto as Annex I, the undersigned counsel had effectively beseeched Defendant's counsel, in pursuing the deposition of the investigating detective, to contact the involved authorities jointly, with the Plaintiff's counsel on the line, which would have eliminated the risk that anything purportedly said in independent conversations would result in further disputes between the parties or before this Court. (<u>*See*</u>, Annex I at page 2.) However, as is made clear from the papers that the Defendant has filed with this Court, the Defendant elected to ignore this request and instead unilaterally contacted the Middlesex Assistant District Attorney's office, resulting in a series of conversations that the Defendant characterizes within its filings with the Court, but which it has not supported with any affidavits. As a result, there is presently an entirely unnecessary dispute between the parties as to the interactions that took place with the Assistant District Attorney. Given the absence of any affidavits in support of the Defendant's characterization of those interactions, the Plaintiff cannot be fairly put to the task of presenting affidavits to rebut those characterizations, but it should be noted that the respective positions of the parties with respect to those interactions are as follows:

5 (A). <u>Defendant's Characterization</u>: *"With Plaintiff's counsel's cooperation, MetLife learned that Middlesex Assistant District Attorney Marian Ryan was handling the investigation into Mr. Zhang's death.* (This assertion appears at page 2 of Defendant's Memorandum in Support of its Motion to Compel. Defendant has not cited any support for this assertion).

<u>Plaintiff's Response</u>: There is nothing before this Court that would support a suggestion that

Defendant "*learned*" any such thing from Plaintiff's counsel, or with the "*cooperation*" of

Plaintiff's counsel, or that Plaintiff's counsel had any knowledge whatsoever about the matters

referred to by the Defendant prior to the Defendant's interactions with Assistant District Attorney

Ryan. The undersigned counsel disputes the above-quoted statement by the Defendant.

5 (B). <u>Defendant's Characterization</u>: *"Assistant District Attorney Ryan first informed MetLife's counsel that there was no investigating officer involved with the case and that she was the only person currently working on the investigation."* (This assertion appears at page 2 of Defendant's Memorandum in Support of its Motion to Compel. Defendant has not cited any support for this assertion).

<u>Plaintiff's Response</u>: Plaintiff has no first-hand knowledge about what may have been said in

any such conversation, because, as noted, the Defendant ignored Plaintiff's request that any such

communications be conducted jointly. However, the Defendant had not provided the Court with

an affidavit that would support a finding that Assistant District Attorney Ryan made the

statement attributed to her by the Defendant, and it is the undersigned counsel's understanding

that, had the Defendant filed an affidavit in support of its characterizations of its interactions with

Ms. Ryan, those characterizations might well have been disputed Ms. Ryan. More specifically, it

is the undersigned counsel's understanding that the following facts are not in dispute (each of

which is represented to be true to the best of the undersigned counsel's knowledge and belief):

(1) Upon receiving, from Defendant's counsel, a copy of a subpoena directed to Assistant

District Attorney Ryan (Annex J), and in view of this Court's Order dated January 6, 2005

(Annex K), Plaintiff's counsel immediately called the District Attorney's Office and spoke (for the first time) with Ms. Ryan, who advised him that she did not have and was not aware that such a subpoena was being sent to her, that her understanding was that there had been an investigating detective on the case, whose name she could obtain by going back through the files, and that she had never denied that there had been an investigating detective on the underlying case, but had rather simply advised whoever it was that had called her from Defendant's counsel's office that the detective's name was not readily available to her during that discussion. (2) Within minutes of that discussion, the undersigned counsel conveyed that information to Defendant's counsel by telephone, and made repeated attempts on each of the next several days to get everyone concerned on the line for a joint conference call, so that Assistant District Attorney Ryan could provide the name of the investigating detective, and so that Defendant's counsel could formally excuse her from having to appear at a deposition or file a motion to quash. (3) The parties were not able to all get on the telephone together prior to the time at which Assistant District Attorney Ryan's deposition had been scheduled to start, but there was no basis for surprise over the fact that it did not start as scheduled given the state of the discussions and messages that were being left between the parties, and Ms. Ryan caused Defendant's counsel to be given the name of the investigating detective either later that day or on the following morning, with the result that there was no need for Assistant District Attorney Ryan's deposition to go forward.

    5 (C). <u>Defendant's Characterization</u>: *"Ms. Ryan failed to appear for the scheduled deposition and did not move to quash."* (This assertion appears at page 3 of Defendant's Memorandum in Support of its Motion to Compel.)

<u>Plaintiff's Response</u>: This assertion is true, but it is also entirely non-controversial. There was no basis for anyone to be surprised or concerned over the fact that Assistant District Attorney Ryan

did not appear for the scheduled deposition, nor was there any reason for her to file a motion to quash, or for anyone to be surprised that she had not done so. No one ever filed, or had any reason to file, a motion to compel that deposition. Given that the issuance of a subpoena to the Assistant District Attorney (Annex J) arguably violated this Court's Order of January 6, 2005 (Annex K), there were abundant reasons for the Defendant not to file such a motion.

Thus, the assertion at page 2 of the Defendant's Reply Brief that *"[W]hen the Assistant District Attorney refused to appear and did not file a motion to quash, MetLife filed a motion to compel the deposition"* is not only unsupported, but completely unsupportable.

(6) Allegation set forth at page 2 the Reply Brief: *"Plaintiff did not oppose the deposition before, but now all of the sudden cries foul that MetLife is pursuing the matter to determine if there was fraud or whether the Plaintiff is a prime suspect. On the one hand, Plaintiff says MetLife did nothing, and on the other, she now says MetLife is doing too much."*

As discussed at length in Section 4, *supra* at pages 8-10, the Plaintiff has never waived her right to raise objections to the discovery being sought by the Plaintiff. Given the submissions made by the Attorney General's Office, the documents produced in discovery pursuant to this Court's initial Discovery Order, and the filings made and conduct engaged in by the Defendant in connection with that discovery, the Plaintiff has every right to join in the objections raised by the Attorney General. Moreover, the Plaintiff's position with respect to these issues was not raised *"all of the sudden"* within its Opposition to the Motion to Compel. As may be seen from the letter attached hereto as Annex H, the arguments raised in the Opposition to the Motion to Compel are virtually identical, word for word, to the arguments raised in the four page, single-spaced letter that Plaintiff's counsel sent to Defendant's counsel back on December 20, 2004.

14

(As discussed *supra* at page 9, the attached copy has been redacted to eliminate references to specific settlement proposals). Moreover, the rationale previously given to the Plaintiff for the Defendant's desire to pursue the deposition in question was that this would facilitate a prompt settlement (*see*, the discussion *supra* at page 9 and the letter attached hereto as Annex I), not that MetLife was "*pursuing the matter to determine if there was fraud or whether the Plaintiff is a prime suspect.*" (Quoting from Defendant's Reply Brief at Page 2). The Defendant has not even alleged "*fraud*" in this case, much less alleged it in the manner that would be required under Fed.R.Civ.P. 9(b) in order to avoid an immediate dismissal of such a claim (which would preclude any discovery of the kind that is presently being sought). *See generally*, in this regard, Rule 9(b) of the Federal Rules of Civil Procedure.

The Defendant is correct that the "*Plaintiff says MetLife did nothing,*" or effectively next to nothing, in response to her claim. The record presently before this Court permits no other finding. However, the Defendant is incorrect in stating that "*the Plaintiff now says that MetLife is doing too much.*" What the Plaintiff has been saying, as articulated in the letter dated December 20, 2004 that is attached hereto as Annex H, and in the Opposition to the Motion to Compel, is that the Defendant cannot try to use this lawsuit, and the powers of this Court, to do what it should have done several years ago, i.e., conduct an investigation and then either pay or deny the Plaintiff's claim for benefits, and provide a response to the demand letter that was sent back on July 7, 2003. Nor may the Defendant use this lawsuit to conduct discovery directed to some hypothetical "*fraud*" that is not grounded in specific allegations of fraud as required by Rule 9(b), or, indeed, in any allegations of fraud whatsoever. Nor may the Defendant overcome the privileges and public policy concerns raised within the Attorney General's Memorandum on

the basis of any of the unsupported and largely unsupportable factual assertions that it has baldly

asserted in this case, or on the basis of the innuendo that permeates its filings in this regard.

(7) Allegation set forth at page 2 the Reply Brief: *"Further, Plaintiff asserts that MetLife has "elected to simply hold onto the use of the policy money...", and that is simply false. Plaintiff's counsel used this phrase in the Opposition Brief knowing that MetLife has not converted the funds...."*

Defendant here has simply misquoted the Plaintiff's Opposition. What the Plaintiff said,

at page 7 of the Opposition, was that the Defendant's *"positing of hypotheticals about what*

*might be 'revealed' through a future 'investigation' ... simply constitutes further evidence in*

*support of one of the Plaintiff's central claims with respect to MetLife's approach to this matter:*

*that instead of either paying or denying the policy, or providing any response to the demand*

*letter referred to above, MetLife elected to simply hold onto **and enjoy** the use of the policy*

*money, and to effectively force the Plaintiff a civil action against the Defendant."* (Quoting from

Plaintiff's Opposition, at p. 7, emphasis added). Plaintiff has not set forth a claim for

"*conversion*" against the Defendant, but rather for unfair insurance practices. Absent some

evidence from the Defendant showing that it put the policy proceeds into an interest bearing

account for the Plaintiff's benefit more than three years ago, the Defendant has little basis for

complaining about the Plaintiff's characterization of the claims set forth in the Complaint.

(8) Allegation set forth at page 3 the Reply Brief: *"Only now, Plaintiff issues a long, detailed reply brief, alleging that MetLife has done nothing, has ignored the claims, and is seeking the deposition in bad faith. How can the parties agree to the deposition and then later, one party claims that the other is pursuing it in bad faith?*

As noted above, the arguments that were set forth in the Plaintiff's eight page Opposition

were not long, or new, and were instead virtually identical to the arguments set forth in Plaintiff's

counsel's letter dated December 20, 2004 (Annex H). The Plaintiff is not suddenly alleging bad faith, but has been affirmatively alleging it since July of 2003, when her prior counsel sent his original demand letter. (A copy of that letter is attached to the Complaint and also appears as Annex C to the Plaintiff's original Opposition). The objection set forth in the Opposition with respect to the deposition (which, as noted in Section 4, *supra* at pages 8-10, was not "*agreed to*") is not that it was originally pursued "*in bad faith*," but rather that the Attorney General has asserted serious, legitimate privileges with respect to that deposition, privileges that the Defendant has not made any serious effort to address or overcome through the presentation of competent evidence to this Court. Instead, the Defendant has responded with arguments that seriously distort the procedural history of this matter, and that are laced with innuendo and false characterizations of the Plaintiff's position in this case. If the Attorney General's Motion to Quash were to be denied in this case - a case where the Defendant has neither filed pleadings nor offered any evidence whatsoever suggesting fraud, and where the Defendant, more than three years after the original submission of the insurance claim, is unable to present this Court with anything other than innuendo and distortions of the procedural history in opposition to the Motion to Quash - then it is hard to conceive of any case in which the policy concerns expressed by the Attorney General could be upheld, or in which Rule 9(b) could be viewed as having any continuing meaning, force or effect.

(9) Allegation set forth at pages 3-4 the Reply Brief: *"Further, Plaintiff did not respond to MetLife's offer to seal the record.... And the District Attorney's office also has not indicated whether this might be acceptable."*

Defendant's offer to "*seal the record*" if it is permitted to take a deposition that it has established no basis for taking in the first place was not responded to because it puts the cart

before the horse, and because the "*sealing*" of the record would not address any of the policy concerns raised within the Attorney General's Memorandum. The unreasonableness and unacceptability of the Defendant's proposal may be appreciated through consideration of what the Defendant's reaction would be if a plaintiff caused subpoenas to be issued to federal and state authorities throughout the nation in an effort to determine whether there was anything within their files concerning MetLife's activities that would support a potential future claim, or potential class action, to the effect that MetLife had a systematic policy of forcing people to sue in order to recover benefits under circumstances such as those presented in the instant case, and then, when MetLife objected, sought to dispose of those objections by offering to "*seal the record.*" Defendant's offer to seal the record does not address the fundamental inadequacy of its presentation in support of conducting the deposition in the first place.

(10)  Allegation set forth at pages 3 of the Reply Brief:  "*...Plaintiff all of the sudden seeks to prevent the deposition from going forward. These actions by Plaintiff are* **suspect**. " (Emphasis in original).

This resort by Defendant to the worst sort of McCarthyite innuendo is sufficient, in and of itself, to provide this Court with adequate grounds for allowing the Motion to Quash and for denying the Motion to Compel. By demonstrating its incapacity to refrain from resorting to such baseless innuendo in pursuit of its own pecuniary interests, the Defendant should be deemed to have forfeited any right that it might wish to assert to fish around through law enforcement files. The Defendant's Reply Brief demonstrates a profound lack of discipline, and a capacity for recklessness, in dealing with the reputations of third parties, including beneficiaries of its own policies, such as the Plaintiff, as well as public servants, such as Assistant District Attorney

Ryan. [5]  The developments that have taken place to date in this case, such as the circumstances

surrounding the issuance of a subpoena to Ms. Ryan notwithstanding the *"short leash"* embodied

by the Court's January 6, 2005 Order, and such as the filing of unsupported papers containing

rank innuendo, provide sufficient grounds for ruling that, under the circumstances of this case,

the public policy concerns raised within the Attorney General's Memorandum would be best

served by an allowance of the Motion to Quash.

## Conclusion

Given the state of the pleadings in this case, the requirements of Rule 9(b), the facts as

evidenced by the discovery completed under this Court's initial Discovery Order, the serious

public policy arguments and concerns raised in the Attorney General's Memorandum, the failure

of the Defendant, either within its Opposition to the Motion to Quash, its Motion to Compel, or

its Reply Brief, to provide any affidavits or other supporting materials that would suggest that

grounds exist for setting aside the Attorney General's arguments and concerns, or which would

---

[5] The Defendant's Reply Brief is not the only filing that it has made with this Court that evidences a capacity for disseminating unfounded innuendo.  In addition to the Defendant's Answer, which implies that some basis for some defense that it has not asserted may be *"revealed"* through further *"investigation"* (*see*, Defendant's Answer, at p. 4), the Defendant used the filing of its entirely redundant and unnecessary *"Motion to Compel"* to infuse further innuendo into these proceedings.  More specifically, the Defendant inserted, into the Rule 37.1 Certificate appearing on the last page of that Motion, the completely unnecessary and misleading assertion that *"Plaintiff's counsel informed me that he did not believe that joining in the Motion [to compel] was necessarily in his client's interest."*  What the Defendant's counsel was *"informed"* of was that Plaintiff's counsel was at a loss as to why a Motion to Compel was even being filed, given that a Motion to Quash was already pending, and that, given the circumstances described herein, Plaintiff's counsel was not going to simply assent to it and would instead respond after reviewing it in the time allowed for under the local rules.  The Court will appreciate that, given the fact that a Motion to Quash was already pending at the time that the Defendant filed its Motion to Compel, there would appear to have been no conceivable reason for the Defendant to file that Motion other than to have an opportunity to insert such puerile innuendo into a Rule 37.1 Certificate, and to force the Plaintiff to file a formal Opposition which the Defendant could then point to as making the Plaintiff *"**suspect**"* (quoting from Defendant's Reply Brief at page 3, emphasis in original).

support the assertions made by the Defendant with respect to the procedural history of this matter, and given the developments and filings made to date, it is respectfully submitted that the Motion to Quash should be allowed and the Motion to Compel should be denied. It is also respectfully submitted that the Court may wish to consider setting this matter down for a motion for judgment on the pleadings or for summary judgment, or for such other proceedings as this Court may deem appropriate. (*See generally*, in this regard, note 2 at page 8, *supra.*)

Respectfully Submitted
By her attorneys,

James F. Ring, Esq. (BBO # 542569)
CHU RING & HAZEL, LLP
49 Melcher Street
Boston, Massachusetts 02210
(617) 443-9800 ext 225

*Certificate of Service*

*I hereby certify that on this 9th day of March, 2005, I served the foregoing Sur-Reply by causing a copy thereof to be sent via telefax and first class mail, potage pre-paid, to counsel of record for all parties.*

James F. Ring